IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 18, 2014

**DALE WAYNE WILBANKS v. STATE OF TENNESSEE**

**Criminal Court for Hawkins County**
No. 13CR0168     John F. Dugger, Judge

_____

**No. E2014-00229-CCA-R3-PC - Filed January 28, 2015**

_____

The Petitioner, Dale Wayne Wilbanks, entered a best interest plea with an agreed upon sentence of twenty years for second degree murder and a concurrent twenty-five years for attempted first degree murder. The Petitioner filed a motion to withdraw his guilty plea and a petition seeking post-conviction relief. After a hearing, the post-conviction court denied the Petitioner relief. The Petitioner now appeals, maintaining that his guilty plea was involuntary and that he received the ineffective assistance of counsel. We affirm the post-conviction court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

Jonathan A. Marion, Sneedville, Tennessee, for the appellant, Dale Wayne Wilbanks.

Herbert H. Slatery, III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Dan Armstrong, District Attorney General; and Alex Pearson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

On May 18, 2012, the Petitioner entered a best interest plea to second degree murder, reduced from first degree felony murder, and to attempted first degree murder. Pursuant to the plea agreement, the trial court sentenced the Petitioner to concurrent sentences of twenty years for the second degree murder conviction and twenty-five years for the attempt to commit first degree murder conviction.

## A. Guilty Plea Submission Hearing

At the guilty plea submission hearing, the trial court admitted an exhibit which included witness statements in support of the Petitioner's best interest plea. The Petitioner agreed to waive a formal presentation of the evidence in lieu of a prosecution report to supply a factual basis for the guilty plea. The affidavit of complaint, contained in the prosecution report, stated the following:

> ON JUNE 3 2010 OFFICERS OF THE HAWKINS COUNTY SHERIFFS OFFICE WERE DISPATCHED TO [the victims' address] TO A SHOOTING. ONE VICTIM JAMES LAWSON WAS FOUND DECEASED IN THE HOME. ANOTHER JUVENILE VICTIM WAS FOUND WOUNDED IN CRITICAL CONDITION. SHE WAS TRANSPORTED TO HOLSTON VALLEY ER FOR TREATMENT. A WITNESS TO THE INCIDENT TOLD [A] DETECTIVE WITH THE SHERIFFS OFFICE THAT THE [PETITIONER] WAS PRESENT WHEN THE VICTIMS WERE SHOT AND LEFT AFTERWARDS. SHE STATES SHE SEEN [Sic] THE [PETITIONER] AND THE MALE VICTIM ARGUING AND THE [PETITIONER] HIT THE MALE VICTIM KNOCKING HIM DOWN. SHE STATES SHE THEN HEARD GUNSHOTS. SHE STATES SHE RAN AFTER THE SHOTS. SHE STATES SHE SEEN [Sic] THE [PETITIONER] LEAVE WHEN SHE STOPPED AND LOOKED BACK. THE JUVENILE FEMALE STATED TO FIRST RESPONDERS THAT SHE WAS TAKING A SHOWER IN THE HOME WHEN A MALE, NOT KNOWN TO HER, JUST SHOT HER. UPON FURTHER INVESTIGATION IT WAS DETERMINED THAT THE [PETITIONER] STOLE A FIREARM FROM THE VICTIMS['] RESIDENCE. THE FIREARM WAS LATER RECOVERED FROM THE VEHICLE THE [PETITIONER] LEFT THE CRIME SCENE IN. THE ABOVE OFFENSE DID OCCUR IN HAWKINS COUNTY TENN.[ ]

The prosecution report also contained two witness statements. The following is a summary of the interview with EB,[1] the juvenile victim:

> [EB] said that she was in the back bedroom getting clothes and heard people talking. She said that there was a woman in the kitchen. [EB] said that the woman said "You got that" and that the man said "Hell no". [Sic] She said

---

[1] It is the policy of this Court to refer to minors by their initials.

that the female said "Make sure you get something" and the man said "I'll take care of it". [Sic]

She said that the woman walked out. She said that the man and [the victim] were talking. She said that she got out of the shower and heard a gunshot and a moan. She said that she heard another gunshot and then a moan. She said she then heard another (gunshot). She said that she looked out and heard a rumble. She said that a man was running at her with a gun. She said that she said please. She said that the man grabbed her and put his hand around her mouth. She said that he put the gun to her neck; she said that it was hot. She said that the man had brown and gray hair. She said that she was naked except for a bra. She said that she felt blood falling. She said that they went through the hall to the living room. [EB] said that [the victim] was on the couch.

She said that they fell on the ground. She said that she hit him in the jaw and grabbed his cheeks. She said that she kept hitting him in the jaw. She said that she tried to get out the door but that he grabbed her and pulled her back. She said that she went down the wheelchair ramp. She said that when the man left he got into a burgundy thing. She said that she looked at him and he flipped her [the] bird and mouthed something like "F**k you bi**h". [Sic] She said that she went back into the house and tried to call. She said that she was on the bed.

[EB] said that the man asked her if she was ready to die while he had her in the headlock. She said that the gun went off in the hallway near the back) [Sic] of the trailer.

[EB] was shot in the left side of the neck area and the bullet exited the right upper lip.

She said that he was on her left side and grabbed her around the mouth with his right hand. She said that they were in the bathroom and she looked in the mirror. She said that there was no blood on the man's hand (before shot).

. . . .

[EB] said that [the victim] sold oxys or roxys. She said that there were pills in a bottle on the table in front of the couch. She said that [the victim] kept a gun in the couch. She said that it was a small gun and had a cylinder in it.

-3-

The trial court explained to the Petitioner the charges and the potential penalties. The Petitioner confirmed his understanding of the plea agreement and the rights he was waiving by entering a plea. The Petitioner confirmed that he was satisfied with his attorney's ("Counsel") representation and that he believed Counsel had properly investigated the case. The Petitioner stated that he did not have any concerns or complaints with regard to his legal representation. The Petitioner testified that he was not being forced to enter the pleas. The trial court found the Petitioner competent to enter the pleas. The Petitioner confirmed that he had reviewed the witness statements in the prosecution report and agreed that those were "fair statements" as to what had occurred. The trial court accepted the Petitioner's plea to second degree murder and attempted first degree murder, and the Petitioner was sentenced to serve concurrent sentences of twenty years for the second degree murder conviction and twenty-five years for the attempt to commit first degree murder conviction pursuant to the parties' negotiated agreement.

## B. Post-Conviction Hearing

The Petitioner, *pro se*, filed a motion to withdraw his guilty pleas on June 15, 2012. On May 15, 2013, the Petitioner, *pro se*, filed a post-conviction petition claiming that he had received the ineffective assistance of counsel and that his guilty plea was involuntary. The trial court appointed an attorney on August 30, 2013, who filed an amended petition for post-conviction relief and an amended motion to withdraw the guilty pleas. The post-conviction court conducted a hearing on the petition and the motion.

At the hearing, the Petitioner testified about Counsel's representation as follows:

> Well, me and [Counsel] I just didn't feel he was handling my case the way that I wanted it handled. I'm not trying to say [he's not] a good lawyer. I've heard good things about him, but when he came to representing certain things I felt I needed to get across, we just didn't seem to communicate and it just - - I'm fighting for my life and I didn't feel he was helping me as much as he should have.
>
> . . . .
>
> I didn't feel that I was getting any type of game plan, any type of how we're going to attack this and go about what I needed brought to the surface. And we discussed - - we had a lot of discussions and we would discuss his old cases, about how he handled certain things. And you know, it just wasn't going the way that I thought it should go. I mean, this is my first time being in a situation like this, so I really don't have a whole lot of experience, but I

-4-

felt like we weren't discussing things that needed to be discussed and handled.

The Petitioner testified that he believed that the investigation of his case was handled "poorly." He explained that he had people he wanted interviewed but that Counsel instead interviewed one person who had "nothing to do with my case." Additionally, Counsel did not have "forensic stuff done" because he did not feel it was necessary. The Petitioner stated that he was "frustrated" with Counsel and that "it kept getting worse and worse and worse."

The Petitioner testified that from "the get-go" he wanted a trial but that Counsel was not prepared for a trial. The Petitioner stated that he expressed his concerns to Counsel during some "heated" conversations. The Petitioner stated that he became concerned in May that Counsel was not prepared for the June trial, so he instructed Counsel to take a specific plea offer to the State. Counsel refused for fear of "insulting" the prosecutor. The Petitioner said that he felt like he had no other choice but to consider a plea agreement in May based upon Counsel's lack of preparation for trial.

The Petitioner testified that, on the day of the plea submission hearing, he told Counsel that he did not want to enter a plea. The Petitioner said that, in response, Counsel threatened to withdraw as counsel and said that the Petitioner was "making the biggest mistake of [his] life." Counsel told the Petitioner that the State would seek additional indictments if the Petitioner did not plead. The Petitioner said that he told Counsel he would not plead guilty because he had not yet spoken with his wife, and Counsel continued to "pressure" the Petitioner. He stated that Counsel was aware that the Petitioner "felt pressured" and told the Petitioner not to tell the trial court that he felt pressured because the trial court would not accept the plea agreement. The Petitioner stated that he felt like he was "out of options" at this point and had to enter a plea.

The Petitioner acknowledged his affirmative responses during the plea colloquy but stated that his demeanor, which evidenced he "wasn't happy," indicated otherwise. He explained that he did not tell the trial court he did not want to enter the plea during the hearing because he was afraid the State would pursue additional indictments against him. He said he was "scared to death."

The Petitioner testified that, several days after the guilty plea submission hearing, he met with another attorney, Margaret Kilgore, on unrelated pending charges in Coffee County. Ms. Kilgore asked the Petitioner why he had entered a plea before she had the opportunity to resolve the pending Coffee County charges. The Petitioner said that Ms. Kilgore informed him that she had spoken with Counsel and advised him to wait to settle the Hawkins County charges so that his Coffee County sentences would not be consecutive sentences. The

-5-

Petitioner said that Counsel had never advised him of this conversation with Ms. Kilgore. He said that Counsel had advised him that his other charges would "more than likely" run concurrent with these sentences. The Petitioner said that, had he known the impact on his other pending charges of entering pleas in these cases, he would not have entered these guilty pleas.

On cross-examination, the Petitioner agreed that he had been previously convicted of criminal felony offenses and, as such, was "familiar" with the court system. The Petitioner stated that he wanted Counsel to interview Cynthia Darnell, Erica Barton, Erica Barton's boyfriend, "JC," and Mary Lawson, the owner of the trailer where the murder occurred. The Petitioner agreed that Counsel provided him with a copy of the discovery in his case and that the discovery included statements from Erica Barton, Cynthia Darnell, and Mary Lawson. The Petitioner conceded that he was unaware of what efforts Counsel had made to speak with these witnesses.

The Petitioner testified that the plea offer he wanted Counsel to convey to the State was fifteen years at 30 percent. The Petitioner agreed that on the same day "or maybe the day before" he signed a plea offer for Counsel to take to the State for eighteen years to be served at 100 percent. The State rejected this offer and, thereafter, the Petitioner signed a plea agreement for twenty years to be served at 100 percent with a concurrent sentence of twenty-five years at 30 percent. The Petitioner agreed that he signed this plea agreement before he was transported to Greeneville, Tennessee, for the guilty plea submission hearing. The Petitioner agreed that Counsel discussed with the Petitioner that he was being charged with two more counts related to the shooting: a gun charge and premeditated murder.

The Petitioner testified that, even though he had already signed the plea agreement, it was not until they were in court in Greenville, Tennessee, that he told Counsel he did not want to enter the plea agreement because he wanted to first speak with his wife. The Petitioner agreed that during the plea colloquy the trial court advised him that the State was going to withdraw the two new charges and reduce the first degree murder charge to second degree murder. The Petitioner agreed that he answered in the affirmative at the plea submission hearing when asked if he was satisfied with Counsel's representation and investigation of his case, and that he understood the sentence. The Petitioner also agreed that Counsel's investigator attempted to locate Cynthia Darnell and that Erica Barton's grandmother was interviewed, which showed efforts to try to locate witnesses he had identified.

The Petitioner testified that he asked Counsel if he needed to address the cases in Coffee County before resolving the Hawkins County cases and that Counsel told him no. The Petitioner agreed that he discussed with Ms. Kilgore, his attorney in Coffee County,

-6-

withdrawing his guilty pleas in Hawkins County. The Petitioner agreed that Counsel had advised him that the United States Attorney's Office in Greeneville was "looking into this case," but he stated that no charges had been filed at the time of his plea.

Margaret Kilgore testified that she represented the Petitioner on charges in Coffee County, Tennessee, in June 2010. About the charges, she stated:

> [The charges] are still pending. And that's not normal for our county to keep charges pending that long. . . . [The Petitioner] came through on our interstate, I-24. And the unfortunate time that he came through was during our Bonnaroo Music Festival. And at that time there are numerous law enforcement, state troopers out, police officers, because the traffic is so heavy. We get about 80,000 people into Coffee County for a four-day weekend. As he came through, a police chase ensued. I think a call had come in about a driver possibly being under the influence of something that led to a chase that went through the City of Manchester, and I know [the Petitioner] was arrested in - - on the outskirts of Manchester in Coffee County.

> . . . .

> He was charged with two counts of aggravated assault, the car being the deadly weapon, evading arrest in a vehicle, I think reckless endangerment, burglary of a vehicle and . . . [t]heft of property and driving on a revoked license.

Ms. Kilgore confirmed that the State had offered to settle the case if the Petitioner agreed to serve eight years as a range two offender, to be served consecutively to any prior sentences.

Ms. Kilgore testified that, in February 2012, she spoke with Counsel and explained that the district attorney's office in Coffee County was "very particular about running their charges consecutively." She and Counsel discussed the June trial date, and she was "trying to make sure that [she] was keeping the Coffee County timeline moving along with the Hawkins County timeline to keep the cases together." She stated that she wanted to have the Petitioner plead in Coffee County first in hopes that the other counties would run the subsequent sentences concurrently. When asked if she conveyed this strategy clearly to Counsel, she said, "I thought I had. I hoped I had. I - - that wasn't the end of the conversation is, gosh, I hope I made the [sic] clear, but that was something that I discussed." Ms. Kilgore acknowledged that the Coffee County charges were not "as serious in nature" as the Hawkins County charges.

-7-

Ms. Kilgore testified that her next contact with Counsel was a voice mail message he left on her telephone stating that the Petitioner had pleaded guilty on May 18, 2012. The Coffee County cases had a discussion date set for May 23, 2012, five days after the Hawkins County plea submission hearing. Ms. Kilgore said that she called Counsel and expressed her "dismay" over the resolution of the Hawkins County cases. She said she thought they might have "even talked about the possibility of withdrawing" the Petitioner's plea in Hawkins County. Ms. Kilgore said that based upon her February 2012 telephone conversation with Counsel she believed the Hawkins County cases were to be tried in June.

On cross-examination, Ms. Kilgore stated that the State had not made a plea offer to the Petitioner on the Coffee County charges at the time the Petitioner pled guilty to the Hawkins County offenses. She said that the May 2012 court date in Coffee County was not a plea date to dispose of the case but a "discussion date." Ms. Kilgore agreed that the Petitioner had other charges in Sullivan County in May 2012, for which he had since entered guilty pleas. Ms. Kilgore agreed that she did not know whether the prosecutors in the other county would have agreed to run the sentences concurrently. She also agreed that she did not know the details of the agreement Counsel negotiated in Hawkins County.

Cindy Wilbanks, the Petitioner's wife, testified that she communicated with Counsel during the course of his representation of the Petitioner. She stated that she did not feel that Counsel represented the Petitioner "zealously." She stated that the last time she spoke with Counsel she told him, "[W]e weren't doing any plea agreement until after the trial in Coffee County." The following day she learned that the Petitioner had signed a plea agreement. Ms. Wilbanks said that she was not present at the Petitioner's guilty plea submission hearing because she was not made aware of the hearing.

As to the plea negotiations, Ms. Wilbanks testified that Counsel would not approach the prosecutor with an offer but waited for the State to make offers. When she asked him why, he told her he would not offer "anything that would embarrass him in front of Berkeley Bell." Based upon this conversation, Ms. Wilbanks believed the case would proceed to trial because Counsel was "not willing to bargain with the DA's office."

Ms. Wilbanks testified that Counsel was not prepared for trial. She recalled that, after the plea submission hearing, the Petitioner told her that he "didn't know what else to do." As to Counsel's overall representation in this case, she stated, "[H]e just didn't have his head in it."

On cross-examination, Ms. Wilbanks stated that she was "surprise[d]" and unaware that Counsel had approached the DA's office "multiple times with different offers." She acknowledged that she spoke with the Petitioner several days before he pleaded guilty and

that she was unaware that the Petitioner had signed the plea agreement two days before the May 18, 2012 plea submission hearing.

Counsel testified that he was appointed to represent the Petitioner in April 2011. He stated that the Petitioner was charged on August 29, 2011, with first degree felony murder in perpetration of a theft and attempted first degree murder. The grand jury later indicted the Petitioner for first degree premeditated murder and employing a firearm during the commission of a dangerous felony. Counsel said that, in addition to these cases, the United States Attorney's Office was considering charging the Petitioner with possession of a firearm by a felon. Counsel recalled that, after the shooting in this case, the Petitioner was charged in the state of Virginia with carjacking and charged in Kingsport, Tennessee, with robbery of a Kmart Pharmacy, stealing a vehicle, robbery of a Rite Aid, and robbery of a Dollar General Store. Thereafter, the Petitioner was charged with the Coffee County offenses.

Counsel testified that he employed a private investigator, Mike Musick, shortly after the Petitioner was indicted. He said that he and Mr. Musick "did a tour of all the different sites in this area that was involved." Mr. Musick searched for Ms. Darnell but was unable to find her. He noted that, at the time, Ms. Darnell was a fugitive from pending criminal charges. Ms. Barton, the seventeen-year-old victim in this case, refused to speak with Counsel or Mr. Musick. Counsel described Ms. Barton's grandmother as "not happy" and refused to allow Ms. Barton to speak with him. He stated that the other persons identified by the Petitioner, J.C. Lawson and Ms. Lawson, were not present at the trailer at the time of the shooting.

Counsel testified that the Petitioner had been provided with the State's discovery before Counsel was appointed. The Petitioner told Counsel that he had given all of the discovery to his wife, so Counsel made another copy of the State's discovery and gave it to the Petitioner. Counsel confirmed that he reviewed the State's discovery with the Petitioner, which included photographs, the autopsy report, and Ms. Barton's medical records. Counsel stated that, even though Ms. Barton would not speak with him, he had her statement to the police and her testimony at the preliminary hearing as part of the State's discovery.

Counsel testified that, in March 2012, Mr. Musick told Counsel that the Petitioner was interested in entering a plea agreement. The State made an offer of thirty-five years to be served at 100%. Counsel explained to the Petitioner that he could receive a sentence of sixty years if he were found guilty of first degree murder, twenty-five years for the attempted first degree murder, and ten years for the gun charge. After this discussion, the Petitioner instructed Counsel to counter offer a plea to a fifteen-year sentence. It was during this discussion that Counsel told the Petitioner that he had spoken with Ms. Kilgore and that the Coffee County prosecutor would likely seek a sentence that would run consecutive to the Hawkins County sentence. He said that he explained consecutive sentencing to the Petitioner

and advised him that each county would determine whether a sentence would run consecutive to or concurrent with the sentences from other counties. Counsel identified an April 25, 2012, letter that he sent to the Hawkins County prosecutor suggesting a fifteen-year sentence to be served at 100% to run concurrent with the pending charges in other jurisdictions. He confirmed that the State rejected this offer.

Counsel testified that the State made another offer of twenty-five years to be served at 100% that he communicated to the Petitioner. After discussion, he made a counter offer of eighteen years to be served at 100% to run concurrent to pending charges in other jurisdictions. The State responded with an offer of twenty years to be served at 100% and informed Counsel that the Hawkins County District Attorney's office did not have jurisdiction to agree to concurrent sentences in other counties. Counsel identified the plea agreement which reflected this offer. Counsel stated that he reviewed the plea agreement with the Petitioner, noting that this was his twelfth meeting with the Petitioner in his thirteen-month representation.

Counsel testified that he reviewed the physical evidence, reports, and Mr. Musick's investigation, and determined that an expert was not necessary in this case. Counsel said that he had handled twenty-nine homicide cases and four death penalty cases in his career. Counsel recalled that he spoke with the Petitioner in the jury room before going into the courtroom for the plea submission hearing. The Petitioner told Counsel to offer the State "several thousand dollars" for the victim restitution fund in an attempt to renegotiate the agreement for a lesser sentence. Counsel said that he advised the Petitioner that he would not convey a monetary offer to the State because he believed that was "crossing the line." He told the Petitioner that he would "walk away and let [the Petitioner] start over before [he] tr[ied] to break [the agreement with the State] because . . . the results would have been horrible for [the Petitioner]." He said that he did advise the Petitioner to "tell the truth" when speaking to the trial court.

On cross-examination, Counsel testified that, during his meeting with the Petitioner when they discussed making a fifteen-year offer to the State, the Petitioner stated he needed to speak with Ms. Kilgore and his Sullivan County attorney. The next time he spoke with the Petitioner, the Petitioner made no mention of whether he had made contact with his other attorneys regarding the Hawkins County plea negotiations.

Counsel testified that the prosecutor in Sullivan County agreed to have the sentences run concurrently but that he had advised the Petitioner that "there are no guaranties in this business."

After hearing the evidence, the post-conviction court issued an order denying relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the trial court improperly denied his motion to withdraw his guilty plea and that due to Counsel's ineffective representation his plea was involuntarily entered without understanding of the nature and consequences of the plea. The State responds that the Petitioner has not adequately demonstrated that he is entitled to relief. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

### A. Withdrawal of Plea

The Petitioner entered a best interest plea on May 18, 2012, and was sentenced pursuant to the plea agreement to serve an effective sentence of twenty-five years. On June 15, 2012, after sentencing but before the judgment was final, the Petitioner filed, *pro se*, a motion to withdraw his plea. He alleged that he was not provided with "all information available" and that he received the ineffective assistance of counsel. The Petitioner argued that he was not informed that his Coffee County sentences would run consecutively if he pleaded to the Hawkins County cases first and that Counsel's ineffective communication, investigation, and preparation for trial warrants withdrawal of his plea.

After a hearing, the post-conviction court issued an order denying the Petitioner relief. In its order the post-conviction court noted that as to the Coffee County offenses, there was no agreed plea date or offer in May 2012. It further noted that the Petitioner had pending charges in multiple counties and the United States Attorney's office was considering additional charges but was waiting to see the outcome of the Hawkins County cases. Relying upon these facts and the transcript of the guilty plea submission hearing, the post-conviction

court concluded that the Petitioner had not proven a manifest injustice existed.

The post-conviction court next considered the Petitioner's allegations regarding Counsel's representation. The post-conviction court found that Counsel was an "experienced trial attorney" and his decisions throughout the representation were reasoned. It further found that Counsel adequately investigated the case and adequately discussed the case and sentencing options with the Petitioner. The post-conviction court found Counsel's testimony credible, and it did not find the Petitioner's testimony credible. As such, the post-conviction court denied relief.

Generally, "a criminal defendant who has pled guilty does not have a unilateral right to later withdraw his plea either before or after sentencing." *State v. Phelps*, 329 S.W.3d 436, 444 (Tenn. 2010); *see also State v. Turner*, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995). Although the trial court "'should always exercise [its] discretion with caution in refusing to set aside a plea of guilty, to the end that one accused of crime may have a fair and impartial trial,'" *Phelps*, 329 S.W.3d at 444 (quoting *Henning v. State*, 184 Tenn. 508, 201 S.W.2d 669, 671 (Tenn. 1947)), "the defendant bears the burden of establishing sufficient grounds for withdrawing his plea." *Phelps*, 329 S.W.3d at 444 (citing *Turner*, 919 S.W.2d at 355).

Whether a defendant should be allowed to withdraw his guilty plea is within the sound discretion of the trial court. *Mellon*, 118 S.W.3d at 345-46 (citing *Henning v. State*, 184 Tenn. 508, 201 S.W.2d 669, 671 (Tenn. 1947)). On appeal, "[t]he trial court's decision 'will not be reversed unless it clearly appears that there was an abuse of discretion.'" *State v. Crowe*, 168 S.W.3d 731, 740 (Tenn .2005) (quoting *Henning*, 201 S.W.2d at 671). "An abuse of discretion exists if the record lacks substantial evidence to support the trial court's conclusion." *Id*. (citing *Goosby v. State*, 917 S.W.2d 700, 705 (Tenn. Crim. App. 1995)).

Rule 32(f) of the Tennessee Rules of Criminal Procedure provides the standards governing the withdrawal of a guilty plea. *Turner*, 919 S.W.2d at 354. The rule is as follows:

(1) Before Sentence Imposed. Before sentence is imposed, the court may grant a motion to withdraw a guilty plea for *any fair and just reason*.

(2) After Sentence But Before Judgment Final. After sentence is imposed but before the judgment becomes final, the court may set aside the judgment of conviction and permit the defendant to withdraw the plea to correct *manifest injustice*.

Tenn. R. Crim. P. 32(f) (emphasis added).  The rule dictates that one of two standards is to be applied, and which standard governs depends on whether a defendant moves to withdraw his guilty plea before or after sentence is imposed.  *Crowe*, 168 S.W.3d at 740-41.  As the Petitioner in the present case moved to withdraw his guilty plea after the sentences were imposed, the latter, more strenuous standard applies.  *See id.*  Accordingly, the trial court should have allowed the guilty plea to be withdrawn only to correct a "manifest injustice." *See id.*; *see also* Tenn. R. Crim. P. 32(f)(2).

Tennessee courts have allowed the withdrawal of guilty pleas to prevent manifest injustice where:

> (1) the plea was entered through a misunderstanding as to its effect, or through fear and fraud, or where it was not made voluntarily; (2) the prosecution failed to disclose exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed.2d 215 (1963), and this failure to disclose influenced the entry of the plea; (3) the plea was not knowingly, voluntarily, and understandingly entered; and (4) the defendant was denied the effective assistance of counsel in connection with the entry of the plea.

*Crowe*, 168 S.W.3d at 742 (citations, footnotes, and internal quotations omitted).  Further, manifest injustice may be found where the State's prosecutor has induced the plea through "gross misrepresentation."  *Turner*, 919 S.W.2d at 355; *see also Swang v. State*, 42 Tenn. 212 (1865).  Courts have also found that manifest injustice resulted from the trial court's failure to advise a defendant of the appropriate sentencing range, to apply the appropriate sentencing statute, or to inform a defendant of the consequences flowing from the guilty plea. *State v. Antonio Demonte Lyons*, No. 01 C01-9508-CR-00263, 1997 WL 469501, at *12 (Tenn. Crim. App., at Nashville, Aug. 15, 1997), *no Tenn. R. App. P. 11 application filed*.

Our review of the record supports the post-conviction court's denial of the Petitioner's motion to withdraw his plea.  The plea submission hearing transcript evinces that the Petitioner understood his sentence and willingly entered the plea.  Further, the Petitioner confirmed that, at the time, he was satisfied with Counsel's representation in the case.  The Petitioner faced numerous charges in multiple counties in Tennessee and a charge in Virginia.  During the plea discussions, the Petitioner told Counsel that the Petitioner would need to speak with his other attorneys about the potential sentences.  During this time, the Petitioner had access to a telephone to contact his other attorneys.  Counsel explained consecutive sentencing to the Petitioner and told him that the matter of consecutive sentencing would be determined by each of the counties.  Counsel attempted to negotiate a sentence that included concurrent sentences with the other counties but this offer was denied by the prosecutor.  Further, Counsel employed an investigator, reviewed the discovery with

the Petitioner, and effectively negotiated for a reduced charge and sentence with the State.

Based upon this evidence, we conclude that the trial court did not abuse its discretion in denying the Petitioner relief. The Petitioner has failed to carry his burden of showing that a manifest injustice exists warranting withdrawal of his plea. The Petitioner is not entitled to relief.

## B. Ineffective Assistance of Counsel

The Petitioner contends that Counsel was ineffective in his representation of the Petitioner. He asserts that Counsel failed "to provide all necessary and relevant information provided by [Ms.] Kilgore," failed to adequately investigate the charges, and pressured the Petitioner into entering the plea agreement. The State responds that the record shows that Counsel was not ineffective and the plea was voluntary and knowing.

When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *see also Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). A plea resulting from ignorance, misunderstanding, coercion, inducement, or threats is not "voluntary." *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). A petitioner's solemn declaration in open court that his plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)

The post-conviction court made the following findings as to the Petitioner's allegations:

The transcript of Petitioner's guilty plea belies all the allegations of the [P]etitioner. Petitioner stated that he understands his plea agreement, that he is satisfied with [Counsel], that he had no complaint about [Counsel], that [Counsel] did everything [the Petitioner] wanted him to do, that [Counsel] did not do something [the Petitioner] did not want him to, and there is nothing that he does not understand

The Court finds that [Counsel] is an experienced trial attorney that has handled twenty-nine homicide cases and four where the death penalty was

sought. [Counsel] and his investigator traveled to all relevant sites of the case, looked at all the state's evidence, went to the house, searched for Cynthia Darnell, a proposed witness who was also a fugitive from justice, attempted to interview Erica Barton but she refused an interview and gave Petitioner a copy of the discovery. [Counsel] testified he did not ask for independent forensic tests because it may hurt us in the long run and did not think they were needed. [Counsel] testified he met with Petitioner twelve times and signed the plea agreement in their last meeting on May 16, 2012 before the May 18, 2012 plea date. [Counsel] testified that they discussed Petitioner's prior convictions and pending charges. [Counsel] and District Attorney C. Berkeley Bell negotiated for several weeks and Mr. Bell would not agree to run [the] Hawkins County [sentences] with [the] Coffee County [sentences].

[Counsel] testified that he did not threaten Petitioner but did tell him a signed plea agreement is a contract that he would withdraw if the contract with the District Attorney is broken. [Counsel] said Petitioner was facing ninety five (95) years at trial and the contract should not be broken. Petitioner claimed he did not have enough time to talk to his wife. The record shows that Petitioner signed the plea agreement two days prior to his entry of the plea. Petitioner had access to a telephone to make calls.

Petitioner testified that he answered "yes" to everything in the best interest plea because [Counsel] told him to. Petitioner is simply telling the Court he was not truthful with the Court during his plea. The Court cannot find that Petitioner is now credible during the evidentiary hearing. [Counsel]'s credibility is impeccable.

The Court finds that [Counsel] was very effective in his representation of Petitioner. [Counsel] had a difficult case, serious charges with a client with a prior record, pending charges and possibly federal charges. [Counsel] obtained the best resolution that could be had for [Petitioner].

As noted above, the post-conviction court credited Counsel's testimony. The post-conviction court found that the Petitioner willingly entered into the plea agreement. The record of the post-conviction hearing reveals the Petitioner indicated his willingness to reach a plea agreement prior to the date he entered his plea, took part in the process of reaching a plea agreement, and communicated specific terms of an acceptable plea agreement to his attorney prior to entering his plea. Moreover, the Petitioner stated that Counsel explained to him his rights and the sentence prior to entering his plea. The Petitioner also acknowledged that the judge explained his rights and the plea agreement to him.

Based upon our review of the record, we conclude the Petitioner received the effective assistance of counsel and knowingly and voluntarily entered his best interest plea. We affirm the judgment of the post-conviction court.

## II. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE